**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DONGFANG SHAO**
**9421 Canonbury Place**
**Fairfax, VA 22031**

       **Plaintiff,**

   **v.**                                  **Civil Action No.** _____

**CARLA HAYDEN, in her capacity as**
**LIBRARIAN of CONGRESS**                    **Jury Trial Demanded**
**101 Independence Avenue, S.E.**
**Washington, DC 20540**

       **Defendant.**

**COMPLAINT AND JURY DEMAND**

      Plaintiff Dongfang Shao, by and through his undersigned counsel, brings this Complaint because the Library of Congress ("Library"), through its management personnel, discriminated and retaliated against him by depriving him of two proper performance evaluations and by various acts of offensive and objectionable conduct constituting harassment, all of which aggregated together created and maintained a hostile work environment which persists, on the basis of his national origin (China), his race (Asian), and his age (67). Dr. Shao seeks appropriate legal and equitable remedies to compensate him for the consequences of these unlawful and adverse acts and to ensure such discriminatory animus which now is pervasive and permeates the Asian Division of the Library ceases.

## I.    JURISDICTION AND VENUE

      1.    This civil action is brought pursuant to the Congressional Accountability Act ("CAA"), 2 U.S.C. §1302(a)(2), which adopts Title VII of the Civil Rights Act of 1964, as amended,

specifically, 42 U.S.C. §2000e *et seq.*( prohibiting discrimination on the basis of national origin and race, among other bases).

2.      This Court has jurisdiction pursuant to 28 U.S.C. §1331 and 42 U.S.C. §2000e-(f), and §2000e-16.

3.      Venue for this Civil Action is appropriate in the United States District Court for the District of Columbia pursuant to 28 U.S.C.§1391 and 2 U.S.C. §1408 because all of the unlawful employment actions at issue action occurred in the District of Columbia.  Dr. Shao is employed with the Library within this judicial district and the Library is within this judicial district.

4.      Dr. Shao has fulfilled all conditions precedent under Title VII of the Civil Rights Act of 1964 prior to commencing this civil action and has otherwise exhausted his administrative remedies.

5.      This civil action is filed within the 70-day period after Dr. Shao filed his initial claim with the Office of Congressional Workplace Rights on December 28, 2020.

## II.   THE PARTIES

6.      Plaintiff Dongfang Shao was born in China and is a male citizen of the United States. Dr. Shao received his undergraduate and graduate degrees in History from Beijing Normal University and a doctorate in History from the University of Hawaii at Manoa.  He taught in the Chinese Studies Department of the National University of Singapore for five and one-half years before joining the faculty of Stanford University as a Visiting Assistant Professor in the Department of Asian Languages in 1999.  Dr. Shao also served on an Advisory Panel for Chinese Library Service for the National Library Board of Singapore.

7.      In 2003, Dr. Shao was appointed head of Stanford's East Asia Library, the University's primary East Asian-language collection in the social sciences and humanities for all historical periods.  During his tenure, he increased the library's international stature, reorganized and doubled its staff and garnered a substantial increase in its base budget.

8.      In 2007 he earned a Master's degree in Library and Information Science from San Jose State University with a thesis on Chinese electronic resources.

9.      Dr. Shao has been employed by the Library of Congress ("Library") continuously since April  2012 as Chief of the Asian Division, a Senior Level ("SL") Executive position.

10.     Defendant Carla Hayden is the Librarian of Congress, the head of the Library, which is an agency of the United States Government.  This civil action is brought against her in her official capacity.

## III.   FACTS

11.     Dr. Shao's supervisor is Eugene Flanagan, the Director of the Library's General and International Collections Directorate ("GICD").

12.     GICD was established in October 2018 after the Collections and Services Directorate was divided into two Directorates.   The other new Directorate was the Special Collections Directorate.

13.     After a national search, Michelle Light was hired as Director of the Special Collections Directorate.  Her educational background includes a B.A. in History from the University of Oregon's R. H. Clark Honors College.  She earned an M.S. in Information (archives and records

management) and an M.A. in History from the University of Michigan. Her professional career in libraries spans 26 years and includes positions of progressive responsibility: head of Special Collections Technical Services at the University of Washington; head of Special Collections, Archives and Digital Scholarship at the University of California, Irvine; and director of Special Collections and Archives at the University of Nevada, Las Vegas ("UNLV"). Her service in these positions reflected extensive hands-on and management experience in such areas as special collections technical services, collection development, digital programs, public service and outreach programs, and fund-raising. At UNLV since 2013, she had been responsible for three units, with up to 55 staff, ranging from faculty members to student employees. She led the division through a reorganization and two strategic-planning cycles.

14.     Mr. Flanagan was appointed as GICD's inaugural director on October 1, 2018. Mr. Flanagan was not hired after an open search, which is the typical process the Library utilizes when it seeks to fill a director level position. Nor did the Library publicly announce the vacancy and appointment for the GICD Directorship.

15.     The Asian Division is one of the most ethnically diverse units in the Library. Workplace diversity and inclusion is given great merit in this multilingual and multicultural organization. "Leveraging Diversity" is reflected in the standard Library Performance Plan/Requirement for supervisors and Senior Level executives. To build solid foundations of diversity and inclusion in the workplace, Dr. Shao has actively worked to create equity and equality in job assignments and evaluations among the 22 employees in the Division, to ensure all employees feel they are valued regardless of their race, gender, ethnicity, culture, religion, or sexual orientation.

16.     The Asian Division of the Library consists of 22 employees, 17 of whom are Asian

American (15), Japanese (1),  or African American (1).  All of the Asian American staff members in the Division are first generation immigrants and have made great contributions towards expanding and managing the Asian collections at the Library, a main purpose for the Library's recruitment of Dr. Shao to become a Senior Level Executive and Chief of the Asian Division of the Library.

17.     Dr. Shao demonstrated an awareness of the benefits of diversity by hiring four reference librarians who are White and  non-Asians, because the Asian Division had only one (1) White employee when he became Chief.

18.     The Asian Division collections at the Library are now estimated to amount to more than 4 million physical items in more than 190 languages and dialects, the largest assemblage of Asian materials outside of Asia.

19.     Prior to Mr. Flanagan's current position, he was Director of National Programs in the Library's National and International Outreach ("NIO") program until NIO was disbanded in 2018. Before the NIO position, he was a Director of Business Enterprises in the Library.  Prior to that, Mr. Flanagan was a Library contractor with KPMG.

20.     Mr. Flanagan supervises Chiefs of seven (7) divisions, including the Asian; African and Middle Eastern; European; Hispanic; Research and Reference Services; Science, Technology and Business; and Serial and Government Documents Divisions.  The first four (4) divisions are international collections, which collect and manage most of the non-English materials in the Library.

21.     The GICD consists of three (3) General Collections divisions and four (4) International Collections divisions.  Five of the seven division Chiefs are White, one  is African American, and Dr. Shao is Asian.

22.     The non-English language collections at the Library account for approximately half

of the Library's book and serial collections.

23.     Mr. Flanagan is not Asian or a person of Asian descent.

24.      According to its 2019 annual report, the Library currently has about 3,210 employees, of whom 57.4% are White, 29.1% are African American, 8.6% are Asian American, and 3.1% are Hispanic.

## IV.     BACKGROUND EVIDENCE OF DISCRIMINATION

25.     On June 24, 2020, Dr. Shao filed a complaint with the Office of Congressional Workplace Rights alleging discrimination on the basis of national origin, race, and age.

26.     Since Mr. Flanagan was named Director, GICD staff across multiple divisions and in particular the Asian Division and its Chief Dr. Shao have experienced a persistent and continuing pattern of racial and national origin discrimination, offensive and objectionable comments and conduct, directed aggressions, and microaggressions carried out and imposed by Mr. Flanagan.

27.     The specific incidents involving Mr. Flanagan's racially discriminatory actions and practices which have served to create and maintain a hostile work environment based on national origin (China) and race (Asian) are set forth in detail below.

28.     The Library is aware of the allegations Dr. Shao has made, but has failed to take any, much less the appropriate and necessary, action to rectify either the discriminatory performance evaluations Mr. Flanagan issued with regard to Dr. Shao or the ongoing discriminatory work environment Dr. Shao and his colleagues are obligated to work in as Library employees under Mr. Flanagan's directorate.

29.     Mr. Flanagan purposefully discredited Dr. Shao's contributions and achievements within the Asian Division of the Library, despite the fact that Dr. Shao's performance had been

recognized and frequently lauded over the past eight and a half (8.5) years prior to Mr. Flanagan's unorthodox appointment to the Directorate.

30.     Senior Executive Level Library employees may be evaluated as (a) Outstanding; (b) Commendable; or (c) Successful.  From 2017 to 2020, the Library of Congress Senior Executive Composite Rating Distribution was as follows:

| Year | Outstanding | Commendable | Successful |
|------|-------------|-------------|------------|
| 2017 | 66% | 31% | 3% |
| 2018 | 39% | 52% | 10% |
| 2019 | 54% | 41% | 5% |
| 2020 | 66% | 30% | 4% |

31.     Dr. Shao has been in the same Senior Level position since he arrived in the Library of Congress in 2012 and received the following ratings for his annual performance rating:

   a.   2013: "Outstanding" (rated by Jeremy Adamson, Director, Collections and Services Directorate).
   b.   2014: "Outstanding" (rated by Jeremy Adamson, Director, Collections and Services Directorate).
   c.   2015: "Outstanding" (rated by Helena Zinkham, Director, Collections and Services Directorate).
   d.   2016: "Outstanding" (rated by Helena Zinkham, Director, Collections and Services Directorate).
   e.   2017: "Outstanding" (rated by Helena Zinkham, Director, Collections and Services Directorate).
   f.   2018: "Commendable" (rated by Helena Zinkham, Director, Collections and Services Directorate).  The "Commendable" rating was a result of the Library's directive that ratings should generally be reduced.
   g.   2019: "Successful" (rated by Eugene Flanagan, Director, General and International Collections Directorate).
   h.   2020: "Successful" (rated by Eugene Flanagan, Director, General and International Collections Directorate).

32.     Mr. Flanagan gave Dr. Shao (reflecting the Asian Division's collective performance) a "Successful" rating for 2019 in October 2019.  Mr. Flanagan did not provide any specific details

or feedback to support the "Successful" rating; nor did he note any negative or constructive comments or suggestions concerning his performance. At no point during the entire rating period, did Mr. Flanagan ever provide any guidance or feedback to Dr. Shao about his and the Asian Division's performance, even though Mr. Flanagan had conducted bi-weekly, one-on-one meetings with Dr. Shao ostensibly to address performance, among other matters.

33.     During the prior mid-year (six-month) progress review with Dr. Shao held in April 2019, Mr. Flanagan similarly did not provide any recommendations or guidance on Dr. Shao's performance nor did he note any negative or constructive comments in Dr. Shao's performance. Mr. Flanagan did not provide any comment to suggest that Dr. Shao was not on track to reach a rating of at least "Commendable."

34.     After Dr. Shao received this "Successful" rating on October 31, 2019, he immediately requested Mr. Flanagan to reconsider the rating. Dr. Shao also responded on November 4, 2019, through the Library's Workforce Performance Management Library of Congress to report Mr. Flanagan's unwarranted and unfair rating.

35.     Among the grounds for the requested reconsideration of the rating issued by Mr. Flanagan, Dr. Shao noted the following: The rating is inconsistent with the achievements of Dr. Shao and the Asian Division in 2019, and is quite disparate and much reduced from the ratings he had received in the past six (6) years while employed by the Library.

36.     As Chief of the Asian Division, Dr. Shao's SL performance goals are intimately entwined with the Asian Division's Annual Performance Goals ("APGs").

37.     In 2019 the Asian Division exceeded all APGs set in Dr. Shao's SL performance plan. The Asian Division 2019 annual report details all the Division's accomplishments as well as

execution of routine responsibilities, projects, and programs.

38.     A "Successful" rating would suggest Dr. Shao's performance in 2019 did not reach the same level as in prior years.  But this was not the case.  Dr. Shao was not made aware of any major changes to the performance rating standards.

39.     Thereafter, on January 13, 2020, Dr. Shao received an email entitled "Senior Level Executive Performance and Recognition Results for the 2019 and 2018 performance Appraisal Cycles", sent by Joe Cappello, acting Chief Human Capital Officer. [Complaint Exhibit 1].  In this email Mr. Cappello noted, "For the 2019 performance cycle, 54 percent of executives received a rating of Outstanding, 41 percentage received a rating of Commendable, and 5 percent received a rating of Successful."

40.     Only upon receipt of Mr. Cappello's email three months after Mr. Flanagan issued Dr. Shao his reduced rating, was Dr. Shao made aware that "Successful" was the lowest rating given to only five (5%) percent of Senior Level employees.  Out of about 80 Senior Level Executives in the Library, this meant that only four (4) received a "Successful" rating.  Most White Senior Level Executives received either "Outstanding" or "Commendable" ratings.

41.     The "Successful" rating given by Mr. Flanagan for FY2019 has not only resulted in damage to Dr. Shao's reputation as the Chief of the Asian Division, but also has had direct negative financial impact.  When the FY2019 Senior Level awards were announced on January 13, 2020, individuals outside of Dr. Shao's protected classifications received higher awards (54% of Senior Levels received $9,000-$10,000, 41% of Senior Levels received $6,000, 5% of Senior Levels, including Dr. Shao, received $3,000).  The unreasonably low rating represented a financial loss in salary and in retirement benefits tied to salary.

42.     In sharp contrast to the rating Mr. Flanagan issued to Dr. Shao, an Asian American, for that same rating period other international collection divisions with otherwise similarly-situated White Chiefs including Mr. Flanagan, who served as Acting Chief of the African and Middle Eastern Division ("AMED"), received "Commendable" or higher ratings.  A comparison of the respective annual reports for these divisions demonstrates that Dr. Shao and the Asian Division performed equally or better than such other divisions, including the African and Middle Eastern Division.

43.     This marked disparity in the assessments issued by Mr. Flanagan lacks any non-discriminatory basis.

44.     This clear disparity in the ratings issued by Mr. Flanagan for 2019 reveals that a pattern of unlawful discrimination exists within the Directorate under Mr. Flanagan as demonstrated by the comparison of Mr. Flanagan's assessment of Dr. Shao with his assessment of the other Chiefs and Acting Chiefs of international collection divisions who are not Persons of Color such as Dr. Shao's peer chiefs in the AMED, European, and Hispanic Divisions.

45.     Further, the Asian Division exceeded its Annual Performance Goals ("APGs"), and in some areas more than doubled those standard goals in 2019 over the prior year.

46.     The "Successful" rating for 2019 that Mr. Flanagan issued to Dr. Shao has not only resulted in damage to the reputation of Dr. Shao and the Asian Division as a whole, but also produced a direct and negative economic impact on Dr. Shao.

47.     Despite various documented work achievements and his leadership of the Asian Division through its steady and substantial growth including (but not limited to) five "Outstanding" ratings and recognition of his successful implementation of various Office of Inspector General ("OIG") recommendations as set forth in its audit report on the Asian Division, after being named

his immediate supervisor Mr. Flanagan chose to downgrade Dr. Shao's rating to "Successful," which foreseeably resulted in Dr. Shao receiving the lowest award in the Library's 2019 SL performance incentive, announced on January 18, 2020, despite his exemplary work as the Chief of Asian Division.

48.     Following the announcement of the SL awards, on February 3, 2020, Grant Harris, Chief of European Division, told Dr. Shao that he had received a "Commendable" rating from Mr. Flanagan for his 2019 annual performance appraisal.

49.     Mr. Harris also stated that compared with Dr. Shao's accomplishments and the Asian Division's achievements in 2019, his own performance was no better than Dr. Shao's because he felt Dr. Shao, as a recommending and custodian division Chief, had accomplished more than he had in that year.

50.     A comparison of the annual reports of the Asian Division and the European Division would result in an objective person concluding that the achievements of the Asian Division which Dr. Shao led in 2019 exceeded those of the European Division which Mr. Harris led.

51.     However, because Mr. Harris is White, Mr. Flanagan gave him a "Commendable" rating which was a higher rating than the one he assigned to Dr. Shao and one which could not be supported by the Library's official documents.

52.     Mr. Flanagan also gave Suzanne Schadl, who is Chief of the Hispanic Division and is White, a "Commendable" rating for the 2019 annual performance appraisal period even though she had arrived at the Library only one year earlier.

53.     Under Mr. Flanagan's Directorate, Asian Americans, like Dr. Shao, are the least likely group to be evaluated for high performance despite having equal or higher educational qualifications

11

and working equally or harder than their non-Asian peers.  This disparity reflects racial and national origin bias by Mr. Flanagan.

54.     Mr. Flanagan gave Dr. Shao (reflecting the Asian Division's performance) a "Successful" rating for FY2019 instead of "Commendable" or "Outstanding."  All other Chiefs supervised by Mr. Flanagan (except for the Science, Technology and Business Division Chief who was harassed by Mr. Flanagan because of his age) received a "Commendable" or "Outstanding" rating from Mr. Flanagan for an equivalent or lesser performance, as evidenced by the Division annual reports and Dr. Shao's accomplishments.

55.     Within the Asian Division, the 2019 the performance ratings for the 22 staff members were as follows: 4 "Outstanding," 15 "Commendable," and 3 "Successful."  Dr. Shao was one of three staff members who received a "Successful" rating.  The other two staff members who received "Successful" ratings were GS-8 technicians who had received disciplinary suspensions without pay for up to 20 work days.

56.     A reasonable person aware of the above facts would recognize that the glaring and otherwise inexplicable disparity appears to arise from the discriminatory animus toward Asians and Asian-Americans that motivates Mr. Flanagan when charged with making employment-related decisions.

57.     Dr. Shao challenged Mr. Flanagan's markedly reduced performance appraisal as unfair and unsubstantiated.  Mr. Flanagan was never able to pinpoint any "real" mistakes in Dr. Shao's work.  Nor had Mr. Flanagan identified any deficiencies.  He did not make any negative comments with regard to Dr. Shao's performance.

58.     But Mr. Flanagan insisted that Dr. Shao, whose evaluation was based on the Asian

Division's annual performance accomplishments, should be given a lower "Successful" rating than he gave to Dr. Shao's fellow Chiefs of international collection divisions who are White.

59.     Mr. Flanagan did not change the rating despite Dr. Shao's request that he do so.

60.     There is no non-discriminatory reason why the similarly-situated international collection divisions' chiefs who are White were treated more favorably in terms of Mr. Flanagan's rating and performance award in 2019.

61.     Tien Doan is another Asian Division employee who was directly slighted in favor of a White colleague.  Mr. Doan is Vietnamese American and has worked for the Library for more than 17 years.   Mr. Doan serves as Special Assistant to Dr. Shao and as the Automation Office Coordinator.  Dr. Shao also appointed him as Recommending Officer for Vietnamese material.

62.     On December 4, 2019, Mr. Flanagan told Dr. Shao that he periodically recommended staff to meet with Associate Librarian for Library Services Robin Dale.  These were to be one-on-one meetings with the Associate Librarian.

63.     Arranging these meetings is not a typical responsibility of the Director of GICD and had not been offered prior to Mr. Flanagan's appointment.

64.     These one-on-one meetings are widely regarded as prestigious opportunities for library employees to meet with a Library senior manager.

65.      Asian Americans have been under-represented in the meetings with the Associate Librarian that were arranged by Mr. Flanagan for GICD employees.

66.      Dr. Shao recommended that Mr. Flanagan invite Mr. Doan to meet with the Associate Librarian because of his consistent high-level performance and his 17 years of service.

67.     Dr. Shao regarded it as highly appropriate to provide this opportunity to Mr. Doan

especially considering the Library's publicly stated assertion affirming the desirability of racial diversity in the Library's activities and because 70 percent of the Asian Division's staff are Asians, and that Asian Americans have been under-represented in such prestigious activities.

68. Despite Dr. Shao's strong basis for his recommendation of Mr. Doan for this prestigious opportunity Mr. Flanagan chose a White employee for this opportunity.

69. Mr. Flanagan's rejection of Dr. Shao's recommendation of Mr. Doan as a particularly appropriate staff member to meet with the Associate Librarian struck Dr. Shao and other Library employees as an intentional slight and disparagement of Dr. Shao, done in a manner to undermine Dr. Shao's authority and status as Chief of the Asian Division.

70. That Mr. Flanagan did so without providing any specific reasons or requesting an alternate candidate from Dr. Shao reinforced the perception that Mr. Flanagan's action manifested anti-Asian animus towards Dr. Shao.

71. Instead of communicating with Dr. Shao regarding his decision to reject Mr. Doan, Mr. Flanagan, without discussing it with either Dr. Shao or with Qi Qiu, directly reached out to recommend that another employee, Jonathan Loar, a South Asian reference librarian supervised by Qi Qiu have the opportunity to meet with the Associate Librarian.

72. Qi Qiu is Head of Scholarly Services in the Asian Division and supervises 10 reference librarians, including Mr. Loar.

73. Mr. Loar is a White male whose 2019 performance rating was lower than Mr. Doan's and who has worked for the Library for only three (3) years.

74. In this way Mr. Flanagan intentionally slighted and disrespected the contributions of Dr. Shao and other Asian Americans employed by the Library; an act that contributed to the ongoing

hostile work environment at the Library.

75.    Mr. Flanagan demonstrated his aggressive animus towards Asian Americans which had created and maintained the ongoing hostile work environment that Dr. Shao and other Library employees experience in another incident involving Mr. Doan.

76.    Another incident contributing to the maintenance of the hostile work environment based on invidious discrimination against employees based on their race (Asian) and national origin (Vietnam) occurred during a WebEx teleconference meeting on April 1, 2020, which three Asian Americans (Mr. Doan, Ms. Qi Qiu, and Dr. Shao) attended with Mr. Flanagan.

77.    When Mr. Doan, who as Dr. Shao's special assistant had been in charge of the Asian Division website migration project since December 17, 2019, suggested some website migration questions during the meeting, Mr. Flanagan retorted, "Whatever you are doing, you need to make me happy."

78.    Upon information and belief, Mr. Flanagan's interjection of himself in that situation was perceived as inappropriate, hostile and disrespectful and it affected Mr. Doan adversely.  Two Asian Americans Qi Qiu and Dr. Shao who were present, were offended and shocked by Mr. Flanagan's interjection.

79.    Upon information and belief, Mr. Flanagan has far less experience in Website Works than Mr. Doan, who had more than 17 years' experience as Webmaster of the Asian Division and had been the lead developer for a Learning Content Management program in the engineering department at the University of Maryland and the co-lead software developer for GM's Fuel Cell program.  He has a Bachelor of Science degree in electronic engineering from the University of Pennsylvania and a Master in Computer Science from the Rochester Institute of Technology.

80.     Discontent within the GICD has increased since Mr. Flanagan became the Director, especially among Asian, Hispanic, and African American employees, including the individuals who are risking possible retaliation to be witnesses.

81.     Since the historic decision in *Cook v. Boorstin*, 40 Fed. R. Serv. 2d (Callaghan) 1213 (D. D.C. 1984), Library employees have filed more than 50 cases alleging unlawful job discrimination and retaliation.  The Library has paid  a considerable sum in damages to these and other victims of unlawful discrimination, harassment and retaliation.

82.      In his capacity as a manager at the Library, Dr. Shao made persistent efforts to try to set a positive example and to be alert to and eliminate unlawful discrimination against Library employees, to bolster minority representation in order to end a decades-long struggle with discrimination, and to expand diversity in the workforce.

83.     The harassment and hostile work environment Mr. Flanagan created altered the terms and conditions of Dr. Shao's employment at the Library.

84.     The offensive and unwelcome harassment occurred because Dr. Shao is Asian, was born in China, and is a senior citizen.

85.     Mr. Flanagan knew, or should have known, that his various actions and certain failures to act created and maintained a hostile work environment, but he and the Library failed to take any steps to prevent the continued  harassment and failed to take prompt remedial action.

86.     Dr. Shao perceived the work environment as hostile and harassing and a reasonable person in his position would view the work environment as hostile and harassing.

87.      Dr. Shao was assigned by Mr. Flanagan to conduct outreach duty for a November 14, 2018 visit by the Ambassador of Bangladesh.

88.     Outreach duty is routinely handled by the Visitor Engagement Office, with the Asian Division's role limited to receiving visitors in the Asian Reading Room and to showing the Asian collections and services.

89.     After the event, Mr. Flanagan severely criticized Dr. Shao's coordination of this event, even though the Ambassador and internal staff involved with the event were all very satisfied with the Ambassador's visit, and the event was executed on par with standards of events executed by non-Asian Division Chiefs.  Mr. Flanagan had criticized the event unjustly, and in stark contrast to the positive feedback received from the Bangladesh Embassy and other officials.

90.     Dr. Shao was chastised as if he were a child after the planned visit to the Asian Division by a high-level diplomat from Bangladesh Embassy.  Plans were changed at the last minute and Dr. Shao was not available when Mr. Flanagan expected him to meet the diplomat. Arrangements for such visits are the responsibility of the Visitor Engagement Office, not the custodial division, in this case the Asian Division.  Dr. Shao was not at fault, but Mr. Flanagan used hostile and negative language to communicate with Dr. Shao.

91.     Mr. Flanagan abruptly changed typical Library protocol and procedures for handling outreach duty, even though the Chief of Visitor Engagement Office, which typically handles these events, agreed to execute the event.  Mr. Flanagan particularly targeted Dr. Shao, the Asian Division Chief, even though the Chief of Visitor Engagements Office, Ms. Giulia Adelfio, agreed to greet the Ambassador, which was part of her routine job.

92.     Mr. Flanagan has not directed any of the other division Chiefs who are non-Asian to perform the same outreach duty, which is atypical of a Chief's usual responsibilities.

93.     Mr. Flanagan never expressed this type of criticism against non-Asian Division Chiefs

17

about receiving foreign visitors.

94.     Mr. Flanagan himself originally agreed to come to the event, but did not show up.

95.     Mr. Flanagan said nothing about his own absence but chose to mischaracterize a successful visit to the Asian Reading Room as a poorly organized event for which he assigned unwarranted blame to Dr. Shao.

96.     Mr. Flanagan's entirely unwarranted disparagement clearly shows his prejudice against Dr. Shao, the Asian Division and Asian Americans.

97.     Upon information and belief, current Asian Division personnel all feel unwarranted displeasure from Mr. Flanagan even though they work just as hard, if not harder, than their non-Asian colleagues and their accomplishments often exceed some of their non-Asian colleagues.

98.     Mr. Flanagan has shown he is unable to be fair to Dr. Shao and other People of Color.

99.     Another example of aggression Mr. Flanagan directed specifically toward  Dr. Shao and not toward other non-Asian chiefs occurred on August 30, 2019, when Mr. Flanagan directed Dr. Shao to "organize all FYIs in common categories."

100.     During the past seven years that Dr. Shao has served as Chief of the Asian Division, this way of organizing FYIs had never been requested, nor is it the typical protocol for organizing these matters.

101.     This directive was not sent to any other chiefs who are non-Asian.  To re-organize all Dr. Shao's activity and FYIs per Mr. Flanagan's direction was a very time-consuming and unnecessary task and a very unfair assignment, as confirmed by Grant Harris, Chief of European Division, who told Dr. Shao that he had never received such a request from Mr. Flanagan.

102.     Grant Harris also pointed out: "I think it's almost redundant to say that they be

18

organized under common categories.  Any FYI emails concerning, for example, item-level barcoding could be all discussed under one agenda item of barcoding, or item-level barcoding."

103.    On a regular and persistent basis since Mr. Flanagan was named GICD Director and became Dr. Shao's supervisor, Dr. Shao has experienced numerous crude microaggressions from Mr. Flanagan with frequent verbal, nonverbal, and environmental slights, snubs, or insults, most of which appear to be intentional.

104.    Mr. Flanagan communicates hostile, derogatory, or negative messages towards Dr. Shao and seeks to dominate and silence Dr. Shao rather than work with him.  This occurs because of Dr. Shao's race (Asian) and national origin (China).

105.    Mr. Flanagan deliberately and regularly fails and refuses to timely respond to many of Dr. Shao's work reports and requests, making it very hard to work with him in conducting Library business.

106.    The harassment and hostile work environment created by Mr. Flanagan became pervasive and altered the terms and conditions of Dr. Shao's employment at the Library.

107.    The harassment was offensive and unwelcome and occurred because Dr. Shao is Asian and was born in China.

108.    Mr. Flanagan knew, or should have known, that his various actions and certain failures to act created and maintained a hostile work environment, but he and the Library failed to take any steps to prevent the continued  harassment and failed to take prompt remedial action.

109.    Dr. Shao perceived the work environment as hostile and harassing and a reasonable person in his position would have viewed the work environment as hostile, harassing and unlawfully discriminatory.

110.    Mr. Flanagan has repeatedly demonstrated his racially motivated negative bias and discrimination against Asian American employees in the Asian Division, while showing positive bias and favor towards White employees.

111.    During one COVID-19 check-in meeting with the Chiefs and reading room heads of GICD in April 2020, Mr. Flanagan rudely interrupted Dr. Shao as he was making suggestions.  Dr. Shao was embarrassed and belittled by Mr. Flanagan's public remarks.  As a result, Dr. Shao has been  silent in most GICD meetings.

112.    Mr. Flanagan did not denigrate White employees.

113.    In 2020, the Asian Division, under the Dr. Shao's leadership, successfully organized two public programs despite the COVID-19 pandemic.  The first was "Boundaries and Brigands: James McCarthy and the Mapping of Siam," a February 25 lecture presented by Harold Meinheit, a former U.S. State Department officer; it was organized by an Asian-American reference librarian, Joshua Kueh.  The second was a October 29 panel discussion on "The Preservation and Presence of Textiles in Library and Museum Collections."   One of the presenters was Eiichi Ito, a Japanese reference librarian in the Asian Division. The second event was organized by two White reference librarians, Charlotte Giles and Jonathan Loar.

114.    Mr. Flanagan showed racial microaggressions towards the Asian American librarians in his recognition and evaluation of the two programs.  Mr. Flanagan expressed no recognition or feedback on the February program, even though he was aware of and approved this program ahead of time.  In sharp contrast, after the conclusion of the October program, Mr. Flanagan  bypassed two levels of supervisors – the Head of Scholarly Services section who supervises all reference librarians and the Chief of the Asian Division – to directly acknowledge two White librarians, without even

mentioning the contribution of the Japanese reference librarian Eiichi Ito to the program.  As the Director of GICD, Mr. Flanagan's evaluation and judgement on a public program is important and carries significant weight, and his actions – or in this case the lack of any recognition – clearly once more reveals his biases against the Asian American employees. These micro-inequities are demonstrated through his different treatments of different employees based on their race.

115.   Mr. Flanagan continually refuses to recognize achievements made by Asian Americans.  He has failed to demonstrate any commitment to fostering a diverse and inclusive culture within his directorate, failing to support diversity programs and a balanced and diverse representation from different groups and grade levels.  Mr. Flanagan has instead chosen to surround himself with like-minded White chiefs and employees, cutting himself off from interactions with other staff, including Asian American subordinates in the Asian Division.  As a result, Mr. Flanagan has not created a culture that nurtures new or diverse ways of thinking, and has done so in part by failing to build relationships with employees of differing races.

116.   Mr. Flanagan lacks interest in serving as a unifying leader within the Library.  He does not try to unite all staff members of difference races, to the point that he does not even pretend to try to do so.  Instead, he tries to divide White people and people of color within his Directorate.  His focus is generally on leveraging his power most explicitly for the sake of the benefits of the White people who support him.  He disparages those people of color within the Directorate who challenge or criticize him.  By continuing to promote these racial biases, Mr. Flanagan antagonizes the racial differences among GICD employees, rather than seeking ways to unify them all.

117.   When he unreasonably delayed and then rejected Dr. Shao's proposed Notice of Proposed Adverse Action, Mr. Flanagan was recognized by both Asian Division staff and the

employee proposed to be disciplined, as having intended to ridicule Dr. Shao's adherence to the applicable Library rules and to embarrass Dr. Shao with the imposition of this unprofessional outcome.

118.     Mr. Flanagan knew that WeChat was a Chinese social media platform censored by Chinese authorities.  Even though Dr. Shao told Mr. Flanagan several times he had stopped using WeChat after Congressional members had raised concerns about security related to Chinese social media including WeChat, on December 5, 2019, Mr. Flanagan deliberately used an unapproved WeChat message out of context in order to support his challenge to Dr. Shao regarding a Notice of Proposed Adverse Action he had issued on October 7, 2019.

119.     Mr. Flanagan violated the regulation prohibiting the use of staff's private text messages without a court order in an adverse action case investigation.  Since "WeChat" is not considered to be a "safe" social media to employ in the context of the Library and its operations, Mr. Flanagan should not have used this piece of a text message for the ongoing investigation.

120.     In fabricating this issue to impugn Dr. Shao's integrity, Mr. Flanagan once again discriminated against Dr. Shao because of his race (Asian) and national origin (China), implying without any evidence that he continued to use WeChat, the Chinese social media platform, regardless of the fact that the Office of the General Counsel knew that Dr. Shao strongly opposed any censorship within the WeChat platform.

121.     When Dr. Shao became aware of unauthorized access to the secured rare book area in Deck 16 by a supervisor, a technician and three Librarians without his approval, he immediately reported it to HCD Employee Relations.  However, on October 30, 2019, Mr. Flanagan claimed that Dr. Shao had waited too long to impose discipline.  Dr. Shao had contacted HCD which conducted

and investigation and then concluded that a suspension was warranted.   When HCD suggested that Dr. Shao could either issue an adverse action or issue a reminder to all Asian Division staff of access to rare material secure areas in the Asian Division and on the updated rare book vault and cages access policy and procedures.   On August 7, 2019, Dr. Shao immediately issued the directive authored by HCD.

## V.   DISCRIMINATION CONTINUES AND PROMPTS A SECOND COMPLAINT

122.   When Dr. Shao disclosed a suspected violation of Library regulations, he feared retaliation or reprisal by Mr. Flanagan.  Mr. Flanagan overturned Dr. Shao's adverse action proposal regarding the hiring of an unqualified candidate for a GS-1410-13 supervisor position.  Mr. Flanagan completely ignored Dr. Shao's report of dishonesty in the translation from Chinese to English of the applicant's  overseas education credentials.   In the Library, where employees are encouraged to report violations of mismanagement and workplace rights, it is important for offices like the Human Capital Division ("HCD"), OIG, and OCWR to serve as regulatory bodies where employees can report these incidents without fear.

123.   Dr. Shao assisted and collaborated on an investigation by the Human Capital Division ("HCD") concerning an internal candidate who was erroneously selected for a GS-1410-13 position in violation of Library regulations.   Dr. Shao and HCD believed that the employee had misrepresented her overseas education credentials.  With HCD's guidance, Dr. Shao issued a Notice of Proposed Adverse Action.

124.   On October 7, 2019, the HCD drafted a statement and asked Dr. Shao to issue a Notice of Proposed Adverse Action ("NPAA") proposing to return the selectee to her prior grade and position.  The NPAA was served on October 7.

125.     Mr. Flanagan then falsely accused Dr. Shao of using WeChat, a Chinese social media platform censored by Chinese authorities.   Subsequently, on December 5, 2019, Mr. Flanagan collaborated with the employee to use a WeChat message to interrogate Dr. Shao about the NPAA.

126.     On January 9, 2020, HCD issued a memorandum determining that the internal selectee did not meet the basic education requirement for the position of Supervisory Librarian. HCD concluded that she had been promoted in error because her submission of transcripts showed that she had not met the educational requirements for the position.

127.     On January 24, 2020, Mr. Flanagan issued an Addendum to the NPAA issued on October 7, 2019.  The Addendum included a memo by Karen Caldwell, HCD's Supervisory Program Specialist, stating that HCD had determined that the selectee had not met the basic education requirement for the position of Supervisory Librarian.

128.     On July 24, 2020, Mr. Flanagan rescinded the NPAA without explaining why the selectee had now become qualified for the position or why he withdrew the NPAA to let her remain in the GS-1410-13 position.

129.     In the academic and professional world, of which the Library is a part, such misrepresentation is a serious form of misconduct.

130.     Mr. Flanagan ignored the Library's rules and Federal laws and overturned the adverse action proposal.  Several months beyond the time period to act on the proposed adverse action Dr. Shao had issued,  Mr. Flanagan continued to fail and refuse to support the proposed adverse action with regard to the selectee, but instead rescinded the NPAA, which was perceived to undermine Dr. Shao's authority.

131.     On December 28, 2020, Dr. Shao filed a second claim with the Office of

Congressional Workplace Rights.  The second claim alleged discrimination and harassment on the basis of race, color, national origin, and age.  The second claim also alleged retaliation because Dr. Shao had initiated proceedings, filed a claim, or testified, assisted, or participated in a hearing or other proceeding under the CAA.

132.    Mr. Flanagan has implied that Dr. Shao lacks knowledge about the Asian Division's management.  In fact, Dr. Shao's commitment to excellence among the Asian Division staff has been recognized since 2012.  His commitment has been expressed in thorough engagement and supervision of others.

133.    Throughout the COVID-19 pandemic, Dr. Shao maintained his commitment to his Division team, often teleworking for more than ten (10) hours per day.  Dr. Shao informed Mr. Flanagan of his teleworking and the stress that the pandemic and teleworking had caused for him and his staff.  The Librarian of Congress had stressed several times that employee safety, including both physical and mental health, remain her highest priority during the pandemic.  Library management implemented guidelines for more flexible work schedules and leave options for employees, including administrative leaves for care-giving.

134.    However, Mr. Flanagan held more meetings than any other directorates for Chiefs and created weekly newsletters for GICD asking each division to contribute weekly and edit it in rotation, which no other directorates in the Library had been doing. Mr. Flanagan intentionally added workloads to Chiefs like Dr. Shao, requiring them to work more hours than before the pandemic, On January 6, 2021, during a one-on-one meeting in which Dr. Shao informed Mr. Flanagan about his overtime work hours, Mr. Flanagan did not sympathize, but instead criticized Dr. Shao for working on many trivial matters (which Mr. Flanagan had assigned) and not focusing on unspecified

"high level" issues.

135.    Mr. Flanagan maintained a very hostile and unfriendly attitude towards Dr. Shao.  As Director of GICD, Mr. Flanagan made no efforts to communicate with Dr. Shao to improve working relations.  Instead, he severely misconstrued the situation to his supervisor, Associate Librarian Robin Dale, as indicated through her knowledge of the situation in her communications to Dr. Shao on November 10, 2020.

136.    Mr. Flanagan attempted to micromanage Dr. Shao's work.  Mr. Flanagan falsely complained in October 2019 that Dr. Shao had not reached a consensus with a supervisor regarding an agreement with the Korea Foundation.  In fact, Dr. Shao had just given the Director and this supervisor some advice concerning previous dealings with the Korea Foundation.  This supervisor was more than happy to work with Dr. Shao and the agreement had been signed by the Deputy Librarian and the Korea Foundation in July 2019.

137.    In October 2019, Mr. Flanagan criticized the amount of time he inaccurately believed Dr. Shao physically spent in his office.  He falsely criticized Dr. Shao for overemphasizing areas which Mr. Flanagan did not take a personal interest in and under-emphasizing areas which seemed less important to Mr. Flanagan, including cataloging unprocessed rare books to increase their availability to Library users.

138.    Dr. Shao emphasized areas like cataloging rare collections in fulfillment of the first objective of the Library's user access goal.  He implemented the OIG's recommendations that the Asian Division pursue cataloging to ensure the security and safety of its valuable assets.

139.    One of the examples of Mr. Flanagan's microaggressions against Dr. Shao was related to the Manchu rare materials cataloging project, which was successfully completed in August of

2020.  Rather than commending Dr. Shao for devising and carrying out the cataloguing of the Manchu collection, Mr. Flanagan criticized Dr. Shao for how the project was rolled out and accomplished.

140.    On October 30, 2019, Mr. Flanagan groundlessly denigrated the Manchu rare collection cataloging project and alleged, falsely, that Dr. Shao had intentionally delayed it. Mr. Flanagan unfairly characterized the unique and challenging project that Dr. Shao's Asian Division staff and a contractor had successfully carried out to be "a project in a mess."

141.    Mr. Flanagan criticized Dr. Shao for a delay in the contract of the Manchu language cataloger whom Dr. Shao had hoped to hire on a temporary contract.  Because of the delay, the potential contractor took a different job and was unavailable.  Dr. Shao was not responsible for the delay.  Mr. Flanagan stated that Dr. Shao should have kept this possible contractor from taking another position.   With his wide and strong professional network, Dr. Shao was able to hire Philip Melzer, a former Library senior cataloger and retired ASME Chief, to do this work when Library funds were available.

142.    Dr. Shao had taken additional responsibility for cataloging rare material that had been in the collection for decades, but had not been cataloged.

143.    The Manchu collection cataloging project was significant for the Library's mission because until the material in the collection could be cataloged and online, it was not accessible to the vast majority of Library users.

144.    The Asian Division had never previously been tasked with any cataloging responsibility, so cataloging anything is work above and beyond the normal mission of the division. To have undertaken and accomplished anything at all in this area was widely recognized as worthy

27

of praise, not the unwarranted criticism asserted by Mr. Flanagan.

145.    Mr. Flanagan's unwarranted criticism of Dr. Shao regarding the Asian Division's Manchu rare book materials cataloging project was done because of Dr. Shao's race (Asian) and national origin (China).

146.    Mr. Flanagan did not follow Library general practices of appointing Acting Directors on the basis of seniority.  On November 23 and December 23, 2020, Mr. Flanagan emailed the staff that he would be on vacation from November 24 to 27 and from December 24 to 31.

147.    Although Dr. Shao is a Senior Level Chief and was available during both periods, Mr. Flanagan instead selected to serve as Acting Director persons who had substantially less seniority and were in lower pay grades classifications than is Dr. Shao.

148.    In July 2020, Dr. Shao worked with Ann Roddy (China Section Head, Asian and Middle Eastern Division, Acquisitions and Bibliographic Access Directorate ("ABA")) and Jessalyn Zoom (Asian and Middle Eastern Division Chief, ABA Directorate) to propose that Asian Division processing technician Ruijing Chen (an Asian American female) detail in the China Section, as its Asian and Middle Eastern Division needed additional assistance with processing incoming Chinese materials.  Several unique circumstances were considered in this detail, including a large backlog of new materials due to the delays caused by the COVID-19 pandemic.

149.    Ms. Chen's initial detail period was from August 2 to September 27, 2020.  Based on Ms. Roddy's performance review, Ms. Chen was trained by a senior technician in the China Section and became proficient in importing copycat records, creating IBC records, LCCN labeling, and shelf labeling.  Additionally, Ms. Chen willingly assisted with any task assigned to her.  She assisted with pandemic-born duties and shared responsibilities, such as opening boxes, shelving new

materials by vendors, and delivering book carts to the Binding and Collections Cure Division.  The China Section's priorities during this detail were strictly to maximize production for the last two months of FY2020, to which Ms. Chen made an outstanding contribution.

150.    Upon the end of Ms. Chen's detail, a 30-day extension of the detail was requested and approved.  At the end of the extension, a permanent reassignment was requested to continue supporting the China Section's work, as continued works within the field of copy cataloguing and maintaining China Section's workflow remained.

151.    This permanent reassignment was supported and approved by all parties, including Asian Division Chief Dr. Shao, ASME Chief Jessalyn Zoom, and ABA Director Beacher Wiggins. The finances of the reassignment were also approved by Library Services Financial Management Director Lieselotte Stubbs.  This reassignment was deemed in the best interest of the Library by both Asian Division and ASME/ABA.  Mr. Flanagan was also made aware of this reassignment request during the Asian Division and ABA's approvals processes, during which he neither commented nor objected.  When the reassignment was due for approval by Mr. Flanagan, he denied the reassignment and overturned Dr. Shao's staffing decision related to his own division, for no specific reason.  Mr. Flanagan's violation of diversity and equal opportunity principles constituted retaliation against Dr. Shao.

## A.    FY2020 ANNUAL PERFORMANCE APPRAISAL AND RATING

152.    On September 17, 2020, Mr. Flanagan sent Dr. Shao an email regarding the End-of-Year SL Performance Cycle.  He included an attachment "2017 - 2019 Library of Congress Senior Executive Composite Rating Distribution vs. 2016 Senior Executive Service (SES) Federal Average."  The email stated, in pertinent part, as follows:

Note the October 2 deadline as the due date for accomplishments to be added in USAP. And please send me a draft of your goals in advance of the October 9 deadline, so we can review together before you submit. If you have any questions about the process, timeline, or USAP, please let me or Tyanne [Rodgers] know.

153.    Dr. Shao sent Mr. Flanagan a draft of his annual performance goals for FY2020 on October 2.

154.    Mr. Flanagan did not contact Dr. Shao again until October 28, when he emailed the following: "Attached is the narrative performance review for FY20.  I will schedule time for us to discuss."  A true and correct copy of the Narrative is attached hereto as Complaint Exhibit 2.

155.    The five Narrative critical elements are: Leading Change, Leading People, Business Acumen, Building Coalitions, and Results Driven.  In Leading Change, Mr. Flanagan acknowledged Dr. Shao's efforts in "plac[ing] the emphasis on developing the digital collections" during the unprecedented COVID-19 pandemic-related shutdown of the Library of Congress, and that "the division also provided services during a time when ILL services for Asian studies collections at other American research libraries are extremely limited."  In Leading People, Mr. Flanagan noted the factual accomplishments of Dr. Shao to "ensure continuity of communications through regular online meetings, and discussions with staff" and Dr. Shao's support "of staff-related development," but does not portray the true significance and value of these accomplishments.  In Business Acumen, Mr. Flanagan notes the Manchu cataloging project, but not the scope and breadth of the accomplishment.

156.    Dr. Shao was completely blindsided by Mr. Flanagan's Narrative performance review and the proposed ratings.  In addition, Mr. Flanagan tremendously downplayed or simply fully neglected to mention Dr. Shao's various contributions and accomplishments to the Library Service's Annual Performance Goals and the Librarian's high priority initiatives in FY2020.

157.    On October 30, 2020, the last day for Senior Level performance appraisal, Mr.

Flanagan met with Dr. Shao for less than 30 minutes to review the performance appraisal.  When Dr.

Shao asked him to reconsider the ratings, he refused to do so.  He did not respond to any of the issues

Dr. Shao raised regarding the Narrative and its low ratings.  Mr. Flanagan did not mention anything

about the Executive Development Performance for FY2021, which Dr. Shao had filled out and

signed before uploading it to USAP for his review, approval, and signature.

158.    After the meeting, Dr. Shao sent an e-mail to Mr. Flanagan stating his disagreement

with the rating.  Dr. Shao wrote that

> I request you to adjust your ratings in all five critical elements of performance before
> the final rating becomes official.  If you are unwilling to do so on the basis of the
> justifications that I have already provided during the discussion today, I will be
> obliged to follow the procedure stated in LCR 9-1610.15.  It is clear to me that your
> current rating does not accurately and fairly reflect my accomplishments in the Asian
> Division and this inappropriate rating is both retaliatory and discriminatory.

159.    The performance appraisal was self-contradictory – although the descriptive Narrative

were factual and appeared very positive, it did not translate into the actual numeric ratings given,

leading to an overall rating of "Successful."  Dr. Shao had obviously accomplished and exceeded

many of both the Asian Division and overall Library of Congress' goals in FY2020, as evidenced

by the Asian Division FY2020 Annual Report and Dr. Shao's performance accomplishments.

160.    Mr. Flanagan's "Successful" rating was unsubstantiated and unfair.  Throughout the

entire rating period, Mr. Flanagan never sent or expressed any guidance or feedback about Dr. Shao's

management of the Asian Division even though they had bi-weekly, one-on-one meetings.  Even

during the mid-year progress review in June 2020, Mr. Flanagan did not provide any

recommendations or guidance that  would suggest that Dr. Shao was not on track to reach a rating

of "Commendable" or "Outstanding."

161.   Mr. Flanagan's narratives and ratings are not reflective of Dr. Shao's annual performance accomplishments.   Dr. Shao has consistently demonstrated a very high level of performance, beyond that required for successful performance in all critical elements.   He is a proven and highly effective leader and has consistently exceeded established performance expectations.

162.   On November 4, 2020, Dr. Shao asked Associate Librarian Robin Dale to review his annual performance rating, which he believed did not truly reflect his level of performance and unfairly underrated his performance and contribution to the Asian Division and to the Library.

163.   Also on November 4, 2020, Dr. Shao notified the Library's Workplace Performance Management Team that Mr. Flanagan had not provided any feedback throughout the appraisal period to warrant the performance rating he received.

164.   On November 10, 2020, Ms. Dale replied and stated that she concurred in two critical elements of Mr. Flanagan's appraisal, but found three critical elements in which she believed additional information supported a higher rating.   She stated that Dr. Shao should meet with Mr. Flanagan by November 30 to discuss FY2021 performance planning.   Ms. Dale stated that the Asian Division led by Dr. Shao had been a consistently strong contributor in achieving GCID and Library Services goals.   Ms. Dale stated that 2020 had been a challenging year and commendable work was done even under difficult circumstances.

165.   On December 20, 2020, the Performance Review Board responded to Dr. Shao. Although the Board recommended a change of the "Successful" rating in two critical elements to "Commendable," the recommendation did not change the overall adjectival rating for the FY2020 appraisal period.   Dr. Shao's rating remained "Successful."

166.     In FY2020, especially under the circumstances of the COVID-19 pandemic, Asian Division staff members under Dr. Shao's leadership have been continuously and consistently delivering high-quality work, pivoting swiftly to maintain uninterrupted user services as well as to enhance telework productivity. The work of Asian Division has also been recognized and acknowledged by other divisions—it maintained excellent cooperative working relationships with the Asian and Middle Eastern Division of the Acquisitions and Bibliographic Access Directorate, the Preservation Directorate, and the Overseas Field Offices. The Asian Division consulted with the Office of General Counsel on the Library's policies, worked with HCD closely on hiring and conduct issues, and received positive comments from the Office of Inspector General in its audit report. The Asian Division's digitization projects have continued to make steadfast progress.

167.     Dr. Shao continued to seek innovative ways to tackle uncatalogued rare collections such as Manchu rare material collection and to automate and standardize work on all fronts. His leadership of the Asian Division during FY2020 should have been assessed as consistently contributing positively beyond established expectations towards the achievement of the Asian Division's performance goals in the development of the Library Services' strategic plan, as well as in the accomplishments of the Library's mission.

168.     Dr. Shao's enduring efforts involve an engaged management style that led to increased performance metrics for the fiscal year, with statistics doubling and tripling in some areas. Under his leadership, Asian Division staff continued producing high-quality and innovative work, and indeed have been recognized and acknowledged by other divisions for their fine service.

169.     There are four (4) divisions of international collections in GICD, which are comparable owing to similar management duties and collection responsibilities.   Their annual

33

reports and the accomplishments of their Chiefs make evident that under Dr. Shao's leadership the Asian Division performance and his accomplishments in FY2020 outperformed that of the other three divisions.  However, the Chief or Acting Chief of the other three divisions received either "Outstanding" or "Commendable" ratings in FY2020 performance appraisals.  Notably, all three are White.

170.    As the most senior and experienced Chief in international collections divisions, Dr. Shao provided great help and guidance to the Chiefs and Acting Chief of the other three divisions, including Mr. Flanagan, who became Acting Chief of the African and Middle Eastern Division in February 2019.

## B.    EXCLUSION FROM SEARCH COMMITTEES

171.    Library regulations require that a Senior Level search panel must consist of members who occupy Senior Level positions.

172.    There are usually three members involved in any search panel.  They should have relevant experience to rely on within that search panel.

173.    Before Mr. Flanagan became GCID Director, Dr. Shao had served as search panel member 14 times, including two searches for GS-15 Supervisory Librarian for acquisitions and collections in which he served as Subject Matter Expert.   Dr. Shao served as Selecting Officer 11 times.

174.    Acquisitions and Bibliographic Access ("ABA")  Director Beacher Wiggins invited Dr. Shao to serve on search panels when the ABA searched for a new African and Middle Eastern Division Chief in 2019 and for a Director of the Islamabad Field Office in 2017.  Both positions were related to international collections.

175. At the invitation of Librarian James Billington in 2014, Dr. Shao served on the search panel for the Director of the Kluge Center and Scholarly Programs, a Senior Level position.

176. On  November 11, 2019, the Library posted a job vacancy for Chief of the African and Middle Eastern Division ("AMED") of GICD, a Senior Level position.

177. Mr. Flanagan selected search panel members, but unfairly and discriminatorily excluded Dr. Shao from this search panel.

178. Within the GICD, the Asian Division and the AMED are two of the four international collection divisions.  Both cover Asian countries and have a majority of Asian American staff.  They are the only two international collection divisions with Senior Level Chiefs.

179. The Asian Division and the AMED are very involved with collection development and management, as well as reference services.  These two divisions are also the only divisions in GICD with custodial responsibilities.  Due to these parallels, Dr. Shao had served as Acting Chief of the AMED several times.

180. Despite Dr. Shao's familiarity with the AMED and experience in maintaining and developing the largest international collection in the Library, Mr. Flanagan did not select him to serve on the AMED Chief search panel, despite his obvious qualifications and experience in both divisions.

181. Dr. Shao learned that the search panel members Mr. Flanagan had selected lacked suitable knowledge, expertise, and familiarity with international collections needed to properly serve on the Library search panel for a new Chief of the AMED Division.

182. Kimberly Bugg, Chief of Research and Reference Services Division (a Senior Level Executive) , told Dr. Shao that she was serving on the search panel.  On January 4, 2020, Ms. Bugg

resigned from the Library of Congress.  Because Ms. Bugg was serving on the search panel, her resignation created a need for a new panel member to replace her since the panel had not yet completed its assigned task.

183.    Once again, Dr. Shao was denied the opportunity to participate in the search panel, despite being an expert on Asian Studies and the only remaining Senior Level chief in GICD.

184.    On March 30, 2020, Mr. Flanagan informed the Chiefs of the international collection divisions,  Grant Harris, Suzanne Schadl and Dr. Shao, that he had scheduled Skype "meet and greets" for the finalists for the AMED Chief position.

185.    Mr. Flanagan said, "I'd appreciate your participation and input in the final selection."

186.    The proposed dates were April 6, 7, and 8.  However, on April 6, 2020, when Dr. Shao checked with Tyanne Rodger, Mr. Flanagan's administrative officer, on how to attend the Skype meeting, he was told that "the meetings have been scheduled and are in progress via Skype."

187.    Subsequently, on April 7, 2020, Mr. Flanagan wrote to Mr. Harris and Dr. Shao that "You do not need to be concerned about these now, … the meetings were being scheduled with the finalists last week so we proceeded with what we had."

188.    This action by Mr. Flanagan was troubling since it reflected the fact that he had acted irregularly with respect to this important search process.  Specifically, during this whole process, he did not reveal who the finalists were, including whether or not any of them were internal candidates. Mr. Flanagan only distributed CVs of the finalists to Ms. Schadl, who is White, and deliberately chose not to send these to Dr. Shao, who was totally excluded from any information about the "meet and greet" opportunity with the finalists.

189.    The Library announced on August 3, 2020, that the position had been filled.

190.    Mr. Flanagan deliberately excluded Dr. Shao from meeting with the finalists.

191.    Mr. Flanagan manipulated the situation and purposefully excluded Dr. Shao from participating in any way within that selection process for an unlawful reason - animus towards Dr. Shao who is an Asian American and was born in China.

192.    Since then, Mr. Flanagan has excluded Dr. Shao from serving on two more search panels in GICD.  On March 24, 2020, the Library announced vacancy for a Senior Level Chief of the Researcher and Reference Services Division.  On April 6, 2020, the Library announced a vacancy for Chief of Serial and Government Documents Division.

193.    The search panel for the Serial and Government Documents Division Chief position consisted entirely of White chiefs including Mr. Flanagan who served as selecting officer.

194.    Through his above-described actions Mr. Flanagan intentionally slighted and disrespected the contributions of Dr. Shao and other Asian Americans employed by the Library.

195.    Mr. Flanagan has contributed to the ongoing hostile work environment at the Library.

## VI.    COUNT 1: NATIONAL ORIGIN, RACE AND AGE DISCRIMINATION

196.    The allegations in paragraphs 1 through 194 are incorporated by reference.

197.    Except for his current position as the Chief of the Asian Division, Dr. Shao has been excluded by Mr. Flanagan from all committees, panels, service groups outside of the Asian Division because Mr. Flanagan deliberately did not recommend him to any of these groups in the Library.  Mr. Flanagan wanted to isolate Dr. Shao from peers in the Library.  Instead he appointed or recommended White Chiefs or librarians to various committees and panels in the Library.  Dr. Shao became the only Chief in GICD without participation in Library committees and panels.  Mr. Flanagan's conduct of deliberate isolation, suppression, and neglect of Dr, Shao has created a work

environment that is hostile and offensive to Dr. Shao.

198.    Under Mr. Flanagan's leadership, GICD is hostile to Asian American employees like Dr. Shao who are bilingual and sometimes speak a foreign language in the workplace.  Such valued employees  have been ignored and silenced by Mr. Flanagan because they are first generation immigrants and non-native speakers of English.

199.    Mr. Flanagan only praises White employees' work and pays no attention to the majority of Asian American employees' contributions.  His biased attitudes can also be seen in what workplaces call "cultural fit."  Cultural fit often relates employees' value, language, behaviors, and customs.  Mr. Flanagan did not engage with Asian American employees in the Asian Division except with disapproval.  In contrast, he praised White employees, even breaking chain of command.

200.    Mr. Flanagan created a work environment biased in favor of White professionals.

201.    Employees like Dr. Shao with a non-native accent—one that does not sound White or American—face a glass ceiling, negatively impacting their performance evaluation or promotion trajectory.

202.    Mr. Flanagan's treatment has diminished Dr. Shao's standing among his peers.  Dr. Shao's professional reputation within the Library was damaged by the discriminatory actions of his supervisor, Mr. Flanagan.

203.    Mr. Flanagan's treatment has caused financial damage by preventing Dr. Shao from receiving larger pay increases, awards, and retirement benefits.

204.    Among Chiefs in GICD whom Mr. Flanagan has insulted and discriminated against are three senior citizens-individuals 65 years or older: Ronald Bluestone and Terisa Sierra, who are both over 70, and Dr. Shao (67 years old).  Mr. Flanagan has targeted the three seniors, constantly

finding "fault" with their work by distorting facts.

205.     As soon as Ms. Sierra (who is a Hispanic-American) presented her proposal on a serials binding contract, Mr. Flanagan began to pick holes in it.  He called her "unprofessional" at a traditional event with the Smithsonian.  Eventually, because of the constant age discrimination she faced from Mr. Flanagan and the hostile work environment he created, she was forced to retire early in November 2019.

206.     Regarding Mr. Bluestone's management of his division, Mr. Flanagan has never stopped nitpicking throughout his directorship.

207.     Mr. Bluestone is the Chief of the Science and Business Division.  He began his career at the Library in 1971.  He was a reference librarian in the Local History and Genealogy Reading Room, the Microform Reading Room and the Main Reading Room of the Humanities and Social Sciences Division.  He then served as the Division's automated resources information specialist.  In 2001, Mr. Bluestone joined the Science, Technology and Business Division, serving as head of the Automation, Collections Support and Technical Reports Section.  He held a collateral assignment as acting head of the Business Reference Section.  He has served as Chief of the Division since October 2007.  Mr. Bluestone holds a Bachelor's degree and a Master's degree from George Washington University, and has conducted archaeological studies in Guatemala in conjunction with post-graduate course work in archaeology at the Catholic University of America.

208.     Since Mr. Flanagan has been GCID Director, Mr. Bluestone has found his work devalued.  Before Mr. Flanagan's Directorship, all of Mr. Bluestone's 48 past annual performance reviews ratings had been "Outstanding" or "Commendable."  Mr. Bluestone's FY2019 rating by Mr. Flanagan was "Successful," putting him in the bottom of supervisors' ratings with only a very small

percentage of entire Library staff to receive this low rating.

209.    Mr. Flanagan even threatened in subsequent follow up meetings with Mr. Bluestone that he would give a "Less Successful" rating in FY2020, without any explanation or further reasoning.

210.    The Congressional Accountability Act ("CAA"), 2 U.S.C. §1302(a)(2), which adopts Title VII of the Civil Rights Act of 1964, as amended, specifically, 42 U.S.C. §2000e *et seq.* prohibiting discrimination on the basis of national origin, race, and age among other bases.

211.    By the conduct described above, the Library, through Mr. Flanagan, discriminated against Dr. Shao because of his national origin, race, and age.

## VII.    COUNT 2: RETALIATION

212.    The allegations in paragraphs 1 through 210 are incorporated by reference.

213.    Anti-discrimination laws prohibit harassment and retaliation for engaging in protected activity.

214.    Mr. Flanagan retaliated against Dr. Shao because he filed a discrimination charge, because he testified in support of a Congressional Research Service employee's OCWR claim, because he participated in an investigation of an improperly promoted employee, and because he filed a civil action against the Library.

215.    By the conduct described above, the Library, through Mr. Flanagan, retaliated against Dr. Shao because he engaged in activity protected by federal laws prohibiting discrimination.

## VIII.    REQUESTED REMEDY

Wherefore, Dr. Shao respectfully requests that this Court enter judgment in his favor and against Defendant, and award the following relief:

40

A.   Declaratory relief, including but not limited to a declaration that Defendant's discriminatory conduct of the types of which Plaintiff complains herein violate Title VII of the Civil Rights Act of 1964.

B.   Injunctive relief, including but not limited to an order restraining Defendant from engaging in any further discriminatory conduct of the types of which Plaintiff complains herein.

C.   Remove Mr. Flanagan permanently from his position with the Library, or at a minimum, as Director of GICD and require Mr. Flanagan to complete an educational program focused on racial identity and workplace diversity and inclusion.

D.   Raise Plaintiff's performance rating for 2019 and 2020 to "Outstanding" with the commensurate salary and award.

E.   Compensatory damages in an amount to be determined.

F.   Attorneys' fees and costs.

G.   Any additional relief as justice allows.

## IX.    JURY DEMAND

Plaintiff demands a jury trial.

Respectfully submitted,

/s/ Jonathan G. Axelrod
Jonathan G. Axelrod (D.C. Bar No. 210245)

/s/ Justin P. Keating
Justin P. Keating (D. C. Bar No.  475602 )

Beins, Axelrod & Keating, P.C.
1717 K Street, NW, Suite 1120
Washington, DC 20006
(202) 328-7222
Fax (202) 328-7030
jaxelrod@beinsaxelrod.com
jkeating@beinsaxelrod.com

Counsel for the Plaintiff